# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

UNITED STATES OF AMERICA

v.                                     CASE NO. 4:16CR16-MW

PEDRO ALFONSO LONGORIA,

> *Defendant.*
_____/

## ORDER GRANTING MOTION TO SUPPRESS

## I.    INTRODUCTION

In Florida, a law enforcement officer may lawfully stop a vehicle if he suspects[1] that the vehicle's rear windows (including the rear side windows) are tinted so that the light transmittance is less than 15% or the reflectance is more than 35%. §316.2954(1)(a), Fla. Stat. (2015); *Lawrence v. Florida*, 942 So. 2d 467, 468 (Fla. 4th DCA 2006) ("The text in section 316.2954(1) was meant to include all windows in the vehicle rearward of the driver, whether on the doors or in the middle rear of the vehicle."). And of course the officer need not be right about the level of tinting—so long as his mistake is reasonable, the seizure is lawful under the Fourth Amendment. *See United States v. Jackson*, 558 F. App'x 932, 933–

---

[1] What level of suspicion is required will be addressed later.

35 (11th Cir. Mar. 10, 2014).

In this case, Trooper Nathaniel Cabe of the Florida Highway Patrol stopped Defendant Pedro Alfonso Longoria's car because he suspected that the car's rear side windows were tinted in excess of the law. ECF No. 20, at 5. He turned out to be wrong, as Longoria's rear side windows were later tested as having a transmittance of 28%—well above the limit. *Id.* n.1. Longoria has filed a motion to suppress evidence that was discovered in his car during the stop, claiming that the stop was made in violation of the Fourth Amendment. ECF No. 17. The question for purposes of this motion is whether a reasonable officer in Trooper Cabe's position could have reasonably suspected that Longoria's rear side windows were illegally tinted. For the reasons set forth herein, the answer is no. The motion to suppress, ECF No. 17, is therefore **GRANTED**.

### A. Facts

#### 1.    *Trooper Cabe*

Trooper Nathaniel Cabe has worked for the Florida Highway Patrol ("FHP") for almost eight years. He has been in FHP's criminal interdiction unit since October 2014. Trooper Cabe's main responsibility as part of the criminal interdiction unit is to try to intercept drug couriers or others involved in criminal activities.

Trooper Cabe estimated (very roughly) at the hearing that he has stopped hundreds of people for tint violations and been wrong—that is, has mistaken lawfully-tinted windows for unlawfully-tinted windows—around 15% of the time. This Court found Trooper Cabe to be forthright, honest, and credible at the suppression hearing.

### 2.     The Stop

On the morning of January 26, 2016, Pedro Alfonso Longoria was driving a grey Dodge Neon on Interstate 10 ("I-10") going east toward Jacksonville. At around mile marker 237—somewhere near the Jefferson County/Madison County line—Longoria passed Trooper Cabe, who was sitting in a FHP vehicle in the median observing eastbound traffic. Longoria was traveling at or just below the speed limit, according to Cabe. As the car passed, Trooper Cabe observed that the front windows of the car were not tinted, but that the rear windows (at least the rear side windows) were tinted.



*Fig. 1: Longoria's car. ECF Nos. 24-1 & 24-3.*

3

Trooper Cabe decided to pull out and follow Longoria's car. As Cabe approached Longoria's car, he noticed that it had Texas license plates and that the rear window—that is, the central rear window, or the "rear glass"—was tinted. Cabe pulled alongside Longoria and remained there for one to three minutes; during that time, he sometimes pulled slightly ahead of Longoria's car and sometimes slowed down and allowed Longoria's car to pull ahead. Trooper Cabe testified at the hearing that he couldn't see in the back of Longoria's car because the rear side window was too dark, and that he felt the windows were too dark.

Eventually, Trooper Cabe decided to pull over Longoria for a suspected tint violation. It turns out, however, that the rear side window was later tested as having a transmittance of 28%, which is well above the limit of 15%. In other words, Trooper Cabe was mistaken, and Longoria was not in violation of the tint statute.[2]

---

[2] There's more to the story, of course—drugs, to be specific—or else we wouldn't be here. But the nature of the evidence sought to be suppressed, as well as the nature of the crime alleged to have been committed, is simply irrelevant to the Fourth Amendment analysis in this case. Accordingly, everything that happened after Longoria was pulled over is not recounted here.

Similarly, Trooper Cabe's subjective reason for pulling over Longoria is not relevant. Trooper Cabe is part of the criminal interdiction unit; it's safe to say that he was not out on I-10 trying to keep motorists safe from illegally-tinted windows. And, as this Court noted at the hearing, that's perfectly fine—it is, in fact, his job. But just as mentioning the nature of the evidence seized would unfairly prejudice the reader against Longoria, a discussion of Trooper

4

Both in its response to the motion to suppress and at the hearing, the Government offered a number of reasons why the tint would have appeared much darker to Trooper Cabe than it really was. The following is an exhaustive list of these reasons broken into various categories.

1. Inherent Features of Longoria's Car
   a. The car was grey.
   b. The interior of the car was dark grey.
   c. The windows' reflectivity made them appear darker.
2. Aspects of Trooper Cabe's Position and Responsibilities
   a. Trooper Cabe was in a Chevy Tahoe SUV, and was therefore looking down at Longoria's car; the angle made the windows appear darker.
   b. Trooper Cabe had to concentrate on driving and on looking out for other possible traffic violations.
3. Environmental Conditions
   a. It was around 10:30 a.m., and the skies were partly cloudy, though mostly clear. These factors interacted with the other non-environmental factors to increase glare and make the windows appear darker.
   b. It was heavily wooded on both sides of the highway, which increased glare and otherwise made the windows appear darker.

Trooper Cabe acknowledged, though, that the environmental conditions—the partly-cloudy skies and the large number of trees lining the road—were not unusual for the area, and further

---

Cabe's true motivations would unfairly prejudice the reader against the Government. This case is about one thing and one thing only; namely, the existence of reasonable suspicion.

acknowledged that the position of the sun relative to his position and the position of Longoria's car at the time he was observing the windows was such that any glare/increased reflectivity from the windows would have been relatively low. He also acknowledged that he is regularly in an SUV and therefore looking down at passenger cars, and that many cars have dark interiors.

### 3.   *Tint Facts*

At the suppression hearing, two witnesses provided useful evidence about window tinting in general. The Government called Trooper Jason Lemery, a longtime FHP trooper who once trained Trooper Cabe. Trooper Lemery testified that the typical "factory tint" on SUVs, minivans, and pickup trucks is around 20% transmittance (give or take a few percentage points) on the rear windows. Passenger cars do not come with tinted windows from the factory. Trooper Lemery also discussed the interplay of reflectivity and perceived darkness (that is, low transmittance), noting that reflectivity can make a window seem darker (that is, can make it seem like it has a lower transmittance). But Trooper Lemery also suggested that different aftermarket tint manufacturers make products with different reflectivities.

Longoria called "Super Dave" Sills, the owner of an auto and

residential tinting business in Tallahassee. Sills has installed aftermarket tinting on thousands of cars. Sills testified that the most common tint levels he installs on the rear windows of cars is 15% and 20% tint—that is, tinting with transmittance ratings of 15% and 20%. He also testified that the factory tinting on SUVs and trucks is around 22%.

Longoria also introduced into evidence a "tint exemplar"—a piece of Plexiglass split into two halves, with each half treated with aftermarket tinting by Super Dave Sills. One half of the exemplar was treated so that its transmittance is approximately 15%, and the other half was treated so that its transmittance is approximately 30%. This exemplar was displayed and discussed at the hearing, but of course the environment in the courtroom is quite different from the environment "in the field." As discussed in more detail later on, the exemplar has proven useful.

### B. Legal Standards

#### 1.    *Probable Cause or Reasonable Suspicion?*

Before starting the analysis, it's necessary to address a purely legal matter. The parties disagree about the level of suspicion needed for an officer to stop a vehicle for a noncriminal traffic

violation consistent with the Fourth Amendment.[3] Longoria claims that probable cause is needed, while the Government argues that reasonable suspicion suffices. The great weight of authority is on the Government's side, *see United States v. Stewart*, 551 F.3d 187, 191–92 (2d Cir. 2009), but the Eleventh Circuit seems not to have weighed in. Since this Court concludes that reasonable suspicion was lacking in this case, it is not necessary to decide the issue—Longoria would prevail no matter what.

2.     *The Reasonable Suspicion Standard*

Under the reasonable suspicion standard, a traffic stop complies with the Fourth Amendment if an officer has "a particularized and objective basis for suspecting" that a traffic violation has occurred or is occurring. *See Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)); *see also Stewart*, 551 F.3d at 191–92. "The 'reasonable suspicion' necessary to justify such a stop 'is dependent upon both the content of information possessed by police and its degree of reliability.'" *Navarette*, 134 S. Ct. at 1687 (quoting *Alabama v.*

---

[3] The Government strenuously contended in its response to the motion to suppress that probable cause was the proper standard, *see* ECF No. 20, at 11–12, but it walked back from that position at the hearing.

*White*, 496 U.S. 325, 330 (1990)). "The standard takes into account 'the totality of the circumstances—the whole picture.'" *Id.* (quoting *Cortez*, 449 U.S. at 417). "[W]hether reasonable suspicion existed at the [relevant] time is a question of law to be determined ultimately by judges, not policemen . . . . And the question . . . is not whether a specific . . . officer . . . actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed to justify" a stop. *Hicks v. Moore*, 422 F.3d 1246, 1252 (11th Cir. 2005). "Although a mere 'hunch' does not create reasonable suspicion, . . . the level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." *Navarette*, 134 S. Ct. at 1687 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

Reasonable suspicion can be based on an officer's mistake of fact, so long as that mistake is reasonable. *Heien v. North Carolina*, 135 S. Ct. 530, 534 (2014). "An officer might, for example, stop a motorist for traveling alone in a high-occupancy vehicle lane, only to discover upon approaching the car that two children are slumped over asleep in the back seat. The driver has not violated

the law, but neither has the officer violated the Fourth Amendment." *Id.* However, a mistake of the sort that would lead to "[a] suspicion so broad that [it] would permit the police to stop a substantial portion of the lawfully driving public . . . is not reasonable." *See United States v. Flores*, 798 F.3d 645, 649 (7th Cir. 2015).[4]

### 3.    *Procedural Matters*

One little-appreciated aspect of warrantless seizures is that the Government bears the burden of establishing reasonable suspicion or probable cause for the seizure at a suppression hearing. *See United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir.1977) ("[I]f a defendant produces evidence that he was arrested or subjected to a search without a warrant, the burden shifts to the government to justify the warrantless arrest or search.")[5]; *see also United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993) (holding that

---

[4] To be sure, *Flores* is a case about an officer's mistake of law, not fact. But the principle is the same—whether a mistake is reasonable has to turn to some degree on the consequences of finding the mistake to be reasonable. Indeed, consequentialist considerations must and do play into the concept of "reasonableness" in many legal contexts. *See, e.g.*, Heidi M. Hurd, *The Deontology of Negligence*, 76 B.U. L. Rev. 249, 249–50 (1996) (describing Judge Learned Hand's formulation of reasonable behavior in a negligence context as "patently and unapologetically consequentialist").

[5] Decisions of the Fifth Circuit handed down prior to October 1, 1981 are binding within the Eleventh Circuit. *Bonner v. City of Pritchard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

under *de la Fuente*, the Government had burden of showing exist-ence of reasonable suspicion to support warrantless seizure). Here, then, the Government must show that a reasonable officer in Trooper Cabe's position could have possessed reasonable suspicion that Longoria's rear side windows were illegally tinted.[6]

In ruling on the motion to suppress, this Court is not limited to evidence that would be admissible at trial. *See de la Fuente*, 548 F.2d at 532–33. This Court has considered the testimony offered at the suppression hearing as well as the facts related by the par-ties in their papers. This Court has also considered the exhibits offered into evidence by the Government and by Longoria, and in particular the tint exemplar.

This Court cannot recreate the conditions that existed on the morning of January 26, 2016. Nor can it conduct an "experiment" on the exemplar that would unambiguously and definitively re-solve the legal issue at the heart of Longoria's motion. But that doesn't mean the exemplar is useless. On the contrary, when the *single thing at issue* is whether a reasonable officer could have mis-taken a window tinted at 28% for a window tinted below 15%, it

---

[6] The Government explicitly stated that it was not offering any alterna-tive basis for the stop.

would be a failure of common sense not to compare the two tint levels. At the very least, examination of the exemplar can help this Court be certain of its conclusion. *Cf. Mitchell v. JCG Indus., Inc.*, 745 F.3d 837, 842 (7th Cir. 2014) (Posner, J.) (describing in-chambers "experiment" in which court staff donned and doffed clothing to ascertain whether party's contention as to donning/doffing time was even plausible). This Court is mindful that (1) the exemplar cannot be examined under the same conditions that were found on the morning of the stop and (2) "a trained officer [can] draw[] inferences and makes deductions . . . that might well elude an untrained person," *United States v. Cortez*, 449 U.S. 411, 418 (1981). With these qualifications in mind, consider the following photographs of the exemplar taken under more "field-like" conditions than those found in the courtroom.



*Fig. 2: The exemplar.*



*Fig 3: Exemplar in front of open passenger-side window.*



*Fig. 4: Exemplar in front of open driver-side window.*



*Fig. 5: Exemplar straight on.*

In examining the exemplar and taking these pictures, this Court was able to make a few general observations, all of which are corroborated by the testimony of the troopers and Super Dave Sills. First, the apparent darkness of the tint is highly dependent on viewing angle. Second, the apparent darkness is greatly affected by what objects are reflected in the glass. Third, from at least some angles, it's difficult to see inside the vehicle through either side of the exemplar.

## II.    ANALYSIS

The Government starts with a bad hand—it has to explain how Officer Cabe could have reasonably suspected that Longoria's rear side windows, which were in fact far from the legal tint limit, exceeded the legal tint limit. The parties (and this Court) initially viewed this central issue as one concerning the reasonableness of Officer Cabe's mistake of fact, and that is indeed one way of looking at this case. There is, however, another way of looking at it—more on that later.

In order to lawfully stop Longoria, Officer Cabe had to take in a number of ambiguous pieces of information from his environment, synthesize them, and arrive at the conclusion that there was

an articulable reason why what he was seeing amounted to a traffic violation.[7] Specifically, he had to be able to reasonably suspect from what he was seeing that Longoria's rear side windows were *unlawfully* tinted.[8]

### A. The "Mistake" View

Imagine that Officer Cabe had stopped Longoria under perfect conditions—that is, under a set of environmental circumstances that would allow a reasonable officer the best chance of discriminating between different levels of tinting. If that had been the case, Longoria's best argument would be that Officer Cabe's mistake of fact as to the level of tint was unreasonable.

The success of this argument would turn to some degree on the Government's asserted reason for the mistake. Consider Chief Justice Roberts's example in *Heien* of a reasonable mistake: "[a]n

---

[7] Of course, Officer Cabe didn't *actually* have to possess reasonable suspicion (though he claims he did)—the inquiry is whether reasonable suspicion objectively existed. *See Hicks*, 422 F.3d at 1252. It's easier, though, to talk of the actual officer rather than repeatedly refer to "a reasonable officer under the circumstances." When Officer Cabe is mentioned in this Order, it should be understood that he is standing in for such a reasonable officer.

[8] This arguably means that he had to be able to reasonably suspect that the rear side windows were tinted so that the transmittance was less than 12%, since "[e]very percentage measurement required by [§§]316.2951–316.2954 is subject to a tolerance of plus or minus 3 percent." §316.2955(2), Fla. Stat. (2015). But whether 15% or 12% is the right number doesn't matter—in any event, there was no reasonable suspicion.

officer . . . [who] stop[s] a motorist for traveling alone in a high-occupancy vehicle lane, only to discover upon approaching the car that two children are slumped over asleep in the back seat." *Heien*, 135 S. Ct. at 534. This mistake is reasonable because the presence of the sleeping children (or any hidden passenger) is unusual and unexpected. Contrast this with the case of an officer who looks over and sees a "driver . . . holding a cellphone in his right hand[] [with] his head . . . bent toward the phone" and stops the driver for violating a no-texting law, only to find that the driver was (lawfully) searching for music—this mistake is not reasonable. *United States v. Paniagua-Garcia*, 813 F.3d 1013, 1014 (7th Cir. 2016) (Posner, J.). It's not reasonable because "the most plausible inference from seeing a driver fiddling with his cellphone is that he is not texting," and "[n]o *fact* perceptible to a police officer glancing into a moving car and observing the driver using a cellphone would enable the officer to determine whether it was a permitted or a forbidden use." *Id.* at 1013–14.

The reasonableness of a mistake of fact (or a mistaken inference) lies in the plausibility and probability of the lawful explanations for the behavior mistakenly perceived as unlawful. The dif-

ference between the officer's mistake in Chief Justice Roberts's hypothetical in *Heien* and the officer's mistake in *Paniagua-Garcia* is that the former's mistake is surprising. Looking at it from the practical standpoint of establishing reasonable suspicion by a preponderance of the evidence, the officer's mistake in the *Heien* hypothetical is easy for the Government to explain—*how could the officer have known there would be children sleeping in the back seat?*—while the *Paniagua-Garcia* officer's mistake is not—*what is it that made the officer think the defendant was* texting *as opposed to doing something lawful?*

In this case, the Government blames the mistake on a number of factors, some environmental and some intrinsic to Longoria's vehicle and Trooper Cabe's viewing situation. Putting aside the environmental factors for a moment, the other factors—the color of the car, the color of the interior, the angle of view, etc.—would not render the mistake reasonable. The fact that the *car* was dark and that the windows appeared very reflective doesn't help at all, because Trooper Cabe could *see* that the car was dark and that the windows were highly reflective and factor that into his assessment of the tint level. Trooper Cabe is *always* looking down at passenger cars from his SUV. And the fact that the interior of Longoria's car

was dark doesn't help, either, because a dark interior (as opposed to hidden passengers) is hardly an unexpected or unusual feature of cars. If an officer could stop any car with tinted windows and justify any mistake as to the perceived level of tint by citing the darkness of the interior, no car with a dark interior and tinted windows could ever be unlawfully stopped.

If environmental conditions had been perfect in this case, it would indeed be a "reasonable mistake" case, and Longoria would have a good argument. For given the size of the mistake—which was of an unusual magnitude, according to Trooper Lemery[9]—and the lack of any surprising or unexpected feature of Longoria's car or Trooper Cabe's point of view that would make the windows appear to be more tinted than they were, the result of finding Trooper Cabe's mistake to be reasonable would be to decide that nearly *all* tint-related mistakes are reasonable. Such a result would be inconsistent with the Fourth Amendment. *See Flores*, 798 F.3d at 649.

---

[9] The mistake was also more serious, at least in percentage terms, than tint-level mistakes that have been found to support reasonable suspicion or probable cause in other cases. *See United States v. Moody*, 240 F. App'x 858 (11th Cir. July 20, 2007) (tint level 30%; statute allowed for 29% given tolerance); *Arizona v. Moreno*, 340 P.3d 426 (Ariz. 2014) (tint level 36%; statute allowed for 30% given tolerance).

So how do the environmental conditions change things? Well, they don't, because like the features of Longoria's car and Trooper Cabe's viewing situation, the environmental conditions were by no means unusual or unexpected or extraordinary. It was a partly cloudy day in North Florida, and the road was tree-lined; if those conditions are sufficient to render Trooper Cabe's mistake reasonable, then, again, virtually *any* mistake as to tint level would be reasonable. Remember, the tint on Longoria's rear windows was not only far from the legal limit, it was also less dark than typical factory or aftermarket tint levels. And Officer Cabe had ample opportunity to view Longoria's windows from a number of angles.

The one "articulable fact" offered by the Government is that Trooper Cabe couldn't see into the back of Longoria's car through the rear windows. It is true that some courts have found that an officer's testimony that he couldn't see into a vehicle can support reasonable suspicion that the windows are unlawfully tinted. *See United States v. Moody*, 240 F. App'x 858, 859 (11th Cir. July 20, 2007); *California v. Curenio*, 2015 WL 9304472, at *3–4 (Cal. Ct. App. Dec. 21, 2015). This Court doesn't think, however, that this

method of determining whether tint might be unlawful is sufficiently reliable to support reasonable suspicion under the circumstances of this case. For one thing, it seems to have failed miserably here. For another, the legal tint limit in Florida is lower than in many other states, making "not being able to see in the back" a poorer indicator of unlawful tinting than in these other cases. *Cf. Moody*, 240 F. App'x at 859 (not being able to determine number of passengers in back could support reasonable suspicion of tint violation where legal tint limit was 30%).[10]

Things would be different if the Government could point to

---

[10] In *United States v. Scanes*, this Court found that there was probable cause for an officer to stop a car for a tint violation when the officer could not see inside the car at all at night. *Scanes*, No. 1:11cr35, 2012 WL 1854271, at *5 (N.D. Fla. May 21, 2012), *aff'd* 572 F. App'x 899 (11th Cir. July 24, 2014). In *Scanes*, though, the officer used a method that would maximize the chance of being able to see inside—he "dr[ove] along side the vehicle and examine[d] the tint in an area where there is some type of backlighting. If he [could] not see inside the vehicle at all, he w[ould] stop the vehicle to check the tint." *Id.* This Court found the technique to be objectively reasonable, *id.*, and the success of the technique corroborated that finding—the car had windows with 14% tint. Moreover, it appears from the record in *Scanes* (though it is by no means 100% clear) that the officer couldn't see through the *front* side windows, either. Such an inability to see would support a stop since the legal tint limit (28%) is much different for these windows. *Cf. Moody*, 240 F. App'x at 859 (not being able to determine number of passengers in back could support reasonable suspicion of tint violation where legal tint limit was 30%). *Scanes* therefore doesn't stand for the proposition that under *all* circumstances, an officer's inability to see into a car is sufficient to support a stop; rather, its holding must be read in light of its facts.

something else besides the array of completely ordinary circumstances to explain the mistake. For instance, if Longoria's backseat had been filled to the brim with black trash bags, blocking out light and making the rear windows appear darker, then the Government would have an excellent case that a mistake as to the tint level was reasonable. This may seem like an odd result—it appears to suggest that the reasonableness of an officer's mistake of fact can depend on facts unknown to the officer—but it's less odd when one remembers that (1) "reasonableness" in this context is a question of law or perhaps a mixed question of law and fact[11] and (2) the burden lies with the Government to demonstrate reasonable suspicion. Credible testimony from an experienced, well-trained officer that he thought a window looked too heavily tinted coupled with an explanation for such a misperception such as the trash bags would likely lead to a conclusion that the officer's mistake was reasonable. Here, though, the reasons offered for the mistake, if accepted as sufficient to render the mistake "reasonable," would

---

[11] *Cf. Illinois v. Rodriguez*, 497 U.S. 177, 184–88 (1990) (whether it is reasonable for officers to think someone giving consent to search a residence has authority to do so is judged against an objective standard); *Hicks*, 422 F.3d at 1252 (whether reasonable suspicion exists is question of law).

basically make every stop of a passenger vehicle with tinted windows lawful. Such a result would eviscerate the Fourth Amendment. In short, the Government has not demonstrated that Officer Cabe's mistake was a reasonable one.

### B. The "Impossibility" View

#### 1.   Forming Reasonable Suspicion Under Trying Conditions

It seems that the environmental conditions on the morning of January 26, 2016 were by no means unusual. But putting aside whether they were unusual or not, the Government argues that they were decidedly not perfect, and that they made Longoria's windows appear much darker than they really were. Under these conditions, the argument goes, it was therefore reasonable for Trooper Cabe to think that Longoria's windows—tinted at 28%— were in fact tinted below the legal limit.

The problem with this argument is that it thrusts the Government headlong into a slightly different Fourth Amendment problem. If it was reasonable for Officer Cabe to think that Longoria's windows with 28% tinting were below the legal tinting limit, then it would have been "reasonable" for him to think almost *any* passenger car with tinted windows had windows too dark under

the conditions. In other words, the environmental conditions were such that a reasonable officer could not reliably distinguish between lawful and unlawful tinting. Under this view, the problem wasn't one of "mistake," really, but rather one of the impossibility of forming reasonable suspicion given the circumstances.

Consider the following hypothetical. Imagine a state law makes it a noncriminal traffic offense to drive a car that's painted black. An officer would normally be able to distinguish between black and non-black cars; on rare occasions he might stop what turned out to be a dark blue car, mistaking it for black, but such a mistake would be reasonable. (If the officer were to stop a white car, the mistake would *not* be reasonable, for reasons discussed earlier—namely, calling such a mistake "reasonable" makes *all* mistakes reasonable.) But now imagine a volcano has erupted, covering all cars on the road in ash. Now *all* cars look black (or at least very dark), and so the officer can't develop reasonable suspicion that any particular car is unlawfully painted black. So long as the environmental conditions persist—so long as all cars on the road look black—the black-car ordinance cannot provide a basis for stopping vehicles.

Applying this reasoning to the case of stops based on illegal

24

tinting, if environmental conditions are such that all (or a large fraction of) tinted windows—legal and illegal—look alike,[12] then an officer can't form reasonable suspicion that any particular window is illegally tinted so long as those environmental conditions persist. The difficulty of distinguishing between lawful and unlawful behavior in such a case might not be as dramatic as in the volcano hypothetical, but the principle is the same—if conditions render lawful and unlawful behavior indistinguishable, or even very difficult to distinguish, then stopping any particular vehicle amounts to guesswork. *Cf. Paniagua-Garcia*, 813 F.3d at 1014–15.

## 2. The Conditions in This Case

Of course, the Government might be able to establish that reasonable suspicion existed under the circumstances notwithstanding the fact that conditions were difficult. A well-trained officer's testimony that he can "correct for" difficult environmental conditions and distinguish between legal and illegal levels of tinting is not to be taken lightly. *See, e.g.*, *Cortez*, 449 U.S. at 418 ("a

---

[12] To be more precise, it's not that all tinted windows have to look *alike* to make reasonable suspicion impossible. Rather, it's that a reasonable officer would have to think almost all tinted windows looked *illegal*. If there's no way under the circumstances for an officer to reliably tie (however roughly) his observations of perceived darkness to objectively measurable tint level, then an observation that a particular car's windows look "too dark" means nothing.

trained officer [can] draw[] inferences and makes deductions . . . that might well elude an untrained person")'; *see also Maryland v. Williams*, 934 A.2d 38, 47–48 (Md. 2007) (holding that a stop for unlawful tint would be proper so long as the officer could "credibly articulate th[e] difference" between legal and illegal window tint). And of course if the officer ended up being correct—if the tint level were in fact too high—it would lend support to the conclusion that the officer wasn't just guessing in stopping the car for excessive tint.

In this case, had Longoria's windows been in fact too heavily tinted, it would be hard to conclude that a reasonable officer would at best be acting on a hunch. It would be easier to credit the idea that, with the proper training, an officer could distinguish tint levels under the trying environmental conditions present in this case. Trooper Cabe's testimony at the hearing—as well as common sense, and of course the examination of the exemplar—would still suggest that, under the conditions, a reasonable officer would have had a tough time distinguishing between lawful and unlawful tinting. But now we would have a very different additional data point—an example of a reasonable officer correctly picking out unlawful tint. This would be a much harder case.

26

The data point we do have, however, is that Officer Cabe grossly misjudged the level of tint on Longoria's rear side windows. And as discussed earlier, there was nothing extraordinary or unexpected or unusual about Longoria's car or Trooper Cabe's vantage point that would make the windows seem that much darker.[13] These facts, taken together with the evidence about the conditions at the time Longoria's car was stopped, help confirm that the circumstances were such that it would have been difficult for a reasonable officer to tell whether tinted windows with a wide range of tint levels were legally or illegally tinted. This makes it impossible for the Government to meet its burden of demonstrating that reasonable suspicion existed. Under the circumstances, it appears that virtually *any* car with tinted windows might have looked "too dark," and picking out an unlawful from a lawful tint level involved

---

[13] Both Trooper Cabe and Trooper Lemery mentioned the reflectivity of the windows on Longoria's car as possibly affecting their perceived tint level. As discussed, this doesn't really help, because an officer could *see* that the windows were reflective and would be able to factor that in. Moreover, to the extent that the reflectivity of the windows made it hard to assess the tint level at all, that doesn't help establish reasonable suspicion—in fact, it supports the notion that it was impossible under the circumstances to distinguish lawful from unlawful tinting. *Cf. Wesby v. District of Columbia*, —F.3d—, 2016 WL 482910, at *4 (Feb. 8, 2016) (Pillard, J., concurring in the denial of rehearing en banc) ("[I]n suggesting that a lack of information—a 'who knows?' gap—could suffice to support probable cause, the dissent advocates a position that would impermissibly shift the burden of discerning probable cause. Officers may not do what the dissent does—posit that a person is up to no good and then ask whether there is clear reason to rule out any theoretical wrongdoing.")

nothing more than guesswork.

## C. A Different Kind of Reasonable Mistake?

The only way out of this for the Government is to argue that Trooper Cabe's reasonable mistake was in (reasonably) not realizing that he couldn't tell the difference between lawfully tinted and unlawfully tinted windows under the circumstances.

Again, consider a hypothetical. Imagine an officer who solely relies on a radar gun to determine whether motorists are speeding. The radar gun is well-calibrated and reliable; it has never let the officer down. One day, for no apparent reason—and unbeknownst to the officer—the radar gun malfunctions and measures a motorist's speed as being in excess of the speed limit when in fact it is not. If the officer stops the motorist, it's clearly based on a mistake of fact. But that mistake of fact is reasonable—and the stop therefore valid under the Fourth Amendment—because the officer's reliance on the radar gun is reasonable. On the other hand, reliance on a radar gun known to frequently malfunction and record incorrect speeds—or even reliance on a radar gun with too large a margin of error—would be unreasonable.

An officer's perception combined with his training and expe-

rience functions as a kind of tool. Like a radar gun, it takes in information and spits out a result—in this case, that result was "those windows are too dark." What the evidence in this case shows is that Officer Cabe's tint-detecting "tool" was faulty, in that it was bound to give unreliable results under the circumstances. But if it was reasonable for Officer Cabe[14] to *think* that his tint-perception tool was not faulty, then perhaps his mistake was reasonable after all.

This theory fails, too, because the evidence shows that the conditions under which the stop was made were quite common. Longoria's car was, again, unexceptional. Officer Cabe testified that the conditions at the time were of the type frequently encountered on I-10. Analogizing to the faulty radar gun example, this was hardly a case of a freak malfunction; a reasonable officer under the circumstances should have been aware of his limited ability to determine whether a window was unlawfully tinted. As defense counsel stated at the hearing, "what it comes down to [is] it's not reasonable if we know you cannot reliably determine whether

---

[14] Again, it is irrelevant whether Officer Cabe himself thought his ability to perceive tint level was faulty; the question is whether it would be reasonable for a reasonable officer under the circumstances to trust his perception. "Officer Cabe" should be understood in this context as a stand-in.

this is too dark or not on a typical Florida day with a fairly typical car. I just don't see how that's reasonable."

### D. The Government's Arguments

#### 1.    *Deference to Law Enforcement*

The Government's primary argument is that an experienced, trained officer like Trooper Cabe is able to distinguish between legal and illegal tint levels, and that great deference must be given to law enforcement officers. While this is true, this argument has its limits—taken to its logical extreme, it would allow an officer to stop almost *any* vehicle with tinted windows. The deference given to law enforcement officers is immense but not infinite. When the circumstances are such that an officer's mistake, if deemed reasonable, would subject a large fraction of the driving public to unwarranted seizures, that deference must give way. *Cf. Flores*, 798 F.3d at 649 ("A suspicion so broad that would permit the police to stop a substantial portion of the lawfully driving public . . . is not reasonable.").

Moreover, when an officer's assessment of illegality turns not on reading body language, knowing a neighborhood, etc., but instead on what amounts to an estimate of an objectively measurable quantity, courts have sometimes been wary of relying entirely

on an officer's training and experience. *See, e.g.*, *United States v. Sowards*, 690 F.3d 583, 591–94 (4th Cir. 2012) ("[W]here an officer estimates that a vehicle is traveling in only slight excess of the legal speed limit, and particularly where the alleged violation is at a speed differential difficult for the naked eye to discern, an officer's visual speed estimate requires additional indicia of reliability to support probable cause."). This seems particularly wise where, as here, the actual officer whose training and experience is being offered to prove the reliability of a reasonable officer's ability to estimate that quantity has made an objectively large mistake. "The 'reasonable suspicion' necessary to justify . . . a stop 'is dependent upon both the content of information possessed by police and its degree of reliability,'" *Navarette*, 134 S. Ct. at 1687 (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). It is difficult to conclude that a reasonable officer possesses a "reliable" way of determining tint level when a putatively reasonable officer has made such a glaring mistake as to tint level.[15]

---

[15] Trooper Cabe did estimate that he's only been wrong about tint levels about 15% percent of the time. This testimony is of limited value, though, because (1) there is absolutely no way to verify or corroborate that estimate, and (2) as both Trooper Cabe and Trooper Lemery pointed out, "every stop is different." Perhaps Trooper Cabe has a 100% success rate when the environmental conditions are one way and a 5% success rate when the environmental conditions are another way. The best evidence of his ability—and a reasonable

2.    *Good Faith and "Reasonableness"*

The Government also points out that "[t]he facts do not support or demonstrate any unreasonable actions or illogical, improper decisions by Trooper Cabe." ECF No. 20, at 18. This is basically true, but beside the point. For one thing, Trooper Cabe's subjective motivations and actions are irrelevant to determining whether there was reasonable suspicion. *See Wren v. United States*, 517 U.S. 806, 813 (1996).

On a deeper level, the Government appears to be conflating the concepts of "reasonable mistake" in the distinct contexts of reasonable suspicion/probable cause and qualified immunity. As the Supreme Court explained in *Heien*, "the [reasonable mistake] inquiry [in the reasonable suspicion/probable cause context] is not as forgiving as the one employed in the distinct context of deciding whether an officer is entitled to qualified immunity for a constitutional or statutory violation." 135 S. Ct. at 539. The Court was talking about mistakes of *law*, but given that *Heien* is a resounding reaffirmation of the principle that mistakes of law and mistakes of fact should be treated the same for Fourth Amendment purposes,

---

officer's ability—to estimate tint level under the circumstances as they were on January 26, 2016 is his (poor) estimate of the tint level on that day.

it seems this idea—that something can be an unreasonable mistake for Fourth Amendment purposes without being so egregious as to lead to the loss of qualified immunity—should apply to mistakes of fact, too. So it is possible to say—and indeed this is what this Court *is* saying—that Trooper Cabe was acting in good faith, was not "plainly incompetent" by any stretch of the imagination, and yet also made an "unreasonable" mistake within the meaning of the Fourth Amendment.

### 3.   *Reflectivity*

Finally, the Government made some suggestion both in its response to the motion to suppress and at the hearing that the stop was justified based on the "increased reflectivity" of Longoria's windows due to the tinting. *See* ECF No. 20, at 12, 14, 18; *see also* Tr. Hr'g ("It does have tint on there but as you can see there's a reflectivity to it which is not allowed by Florida Statutes."). This argument suffers from at least three problems.

First, there is no evidence in the record of what the actual reflectivity of Longoria's windows was, and therefore no way of determining how correct or incorrect Trooper Cabe's assessment of the reflectivity was. Second, for the same reasons already discussed with respect to the tint level (darkness), it appears that the

conditions were such that there was no way for an officer to relia-
bly tell whether the level of reflectivity was too high. Third, the
officers who testified—and the Government—appear to be laboring
under a mistaken view of the law. The relevant statute does not,
as they contend, prohibit aftermarket tinting that increases the
reflectivity of windows to any degree. Rather, it provides that "[a]
person shall not operate any motor vehicle . . . on which vehicle
any windows behind the driver are . . . treated with any sunscreen-
ing material, or other product or material which has the effect of
making the window nontransparent or which would alter the win-
dow's color, increase its reflectivity, or reduce its light transmit-
tance, *except as specified below*," and then goes on to state that
tinting may be applied if it leads to a "total solar reflectance of
visible light of not more than 35 percent." §316.2954(1)(a), Fla.
Stat. (2015) (emphasis added). To read this statute as prohibiting
*any* treatment that increases reflectivity[16] makes no sense and is
objectively unreasonable. To the extent the Government tries to

---

[16] "Reflectance" is a technical term that "means the ratio of the amount
of total light, expressed in a percentage, which is reflected outward by the prod-
uct or material to the amount of total light falling on the product or material."
§316.2951(3), Fla. Stat. (2015). Reflectivity is not defined in Florida Statutes,
though presumably it means the same thing as "reflectance" in that context.
Reflectivity has a technical meaning, too, though for purposes of this Order it
more or less means "shininess."

base reasonable suspicion on Trooper Cabe's observation that Longoria's windows seemed to have *any* amount of increased reflectivity, this argument fails, because an *unreasonable* mistake of law cannot help form the basis of reasonable suspicion. *See Heien*, 135 S. Ct. at 536–37.

### E. Suppression

Having determined that the stop of Longoria's car was made without reasonable suspicion that a traffic violation had occurred or was occurring, the question becomes whether there is some exception to the exclusionary rule that would preclude suppression, or whether the "taint" of the initial illegality of the stop was purged before the evidence was seized. The Government argues, somewhat half-heartedly, that "[o]nce Trooper Cabe asked for [Longoria's] driver's license and [Longoria] stated that he did not have one because it was suspended, the traffic stop transitioned into a criminal violation." ECF No. 20, at 27.

To the extent this is an attempt to argue that Longoria's lack of a license "cured" the Fourth Amendment violation of the initial stop, it fails. It is true that if someone unlawfully detained by law enforcement commits "a new, distinct crime" while being detained,

that may allow for search and arrest and cure the taint of the initially unlawful seizure. *See United States v. Bailey*, 691 F.2d 1009, 1016–17 (11th Cir. 1982). But when that person performs a non-criminal act that "merely reveals a crime that has been or is being committed by the time of" the unlawful stop, the taint of the unlawful stop is not sufficiently attenuated. *See id.* In this case, Longoria didn't commit a new crime—he revealed to Trooper Cabe that he was already unlawfully driving without a license. Therefore, the drugs were clearly the "fruits of the poisonous tree" and must be excluded from evidence. *See United States v. Chanthasouxat*, 342 F.3d 1271, 1280–81 (11th Cir. 2003).

## III.   CONCLUSION

This Court is not convinced that a reasonable officer under the circumstances could have reasonably suspected that Longoria's rear side windows were illegally tinted. One of two things happened: either Trooper Cabe made an unreasonable mistake in determining that the windows were illegally tinted, or the circumstances were such that he was in the position of basically guessing

as to whether the windows were illegally tinted. Either way, reasonable suspicion was lacking.

Accordingly,

**IT IS ORDERED:**

Defendant's Motion to Suppress, ECF No. 17, is **GRANTED**.

**SO ORDERED on April 23, 2016.**

<u>**s/Mark E. Walker**</u>
**United States District Judge**